**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KEVIN MULLIGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 11 C 8200** |
| | ) | |
| **v.** | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| **VILLAGE OF RIVERSIDE, an** | ) | |
| **Illinois corporation, and MATTHEW** | ) | |
| **BUCKLEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff sues defendant the Village of Riverside ("the Village") for its alleged violations of the Americans with Disabilities Act ("ADA") and defendant Matthew Buckley for defamation. Each defendant has filed a Federal Rule of Civil Procedure 56 motion for summary judgment. For the reasons set forth below, the Court grants in part and denies in part the Village's motion and denies Buckley's motion.

## Facts

In 1983, the Village hired plaintiff as an on-call firefighter. (Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶ 20.) Over the next twenty-three years, he rose from firefighter to lieutenant, captain, assistant chief and chief of the Village fire department. (*Id.*) Because many of these positions, including fire chief, are part-time, since 1983 plaintiff has also worked for the Pleasantview Fire Protection District. (*Id.* ¶ 21.)

When plaintiff became fire chief in May 2006, defendant Matthew Buckley ("Buckley") and his brother John Buckley were the deputy chiefs who reported to him. (*Id.* ¶ 14.) Plaintiff quickly

became dissatisfied with Buckley's performance. (*Id.* ¶ 24.) When he told Buckley about the problems, their relationship seriously deteriorated. (*Id.*)

On December 7, 2008, while the two were discussing a work matter, Buckley accused plaintiff of drinking on duty. (*Id.* ¶ 25.) Plaintiff reported Buckley's accusation to then-Village Manager Kathleen Rush, who put plaintiff on paid leave pending an investigation. (*Id.* ¶¶ 6, 26.)

After an investigation in which five fire department officers said they believed plaintiff had been impaired by alcohol while on duty, Rush sent plaintiff to the employee assistance program ("EAP") for an alcohol evaluation. (*Id.* ¶ 27.) The EAP evaluator concluded that "there [was] no substance abuse issue" and "cleared [plaintiff] to resume [his] duties." (Village's LR 56.1(a) Stmt., Ex. B, Mulligan Dep. Ex. 12, Mem. from Rush to Mulligan (Dec. 31, 2008).) Nonetheless, the Village conditioned plaintiff's return to work on his execution of a "Last Chance Agreement," which required him to meet all EAP requirements and submit to periodic alcohol screening tests. (*See id.*, Last Chance Agreement.) According to plaintiff, when he returned to work in January 2009, Rush told him not to take any disciplinary action against Buckley because it could be viewed as retaliation. (Village's LR 56.1(a) Stmt., Ex. B, Mulligan Dep. at 46-48.)

In May 2009, plaintiff attended a meeting with Rush, who was leaving the Village Manager position, Robin Weaver, who was appointed interim Village Manager, incoming Village President Michael Gorman, and outgoing President Harold Wiaduck. (Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶ 34.) Plaintiff says he was again told during that meeting "not to take any action [against Buckley] that would be considered retaliatory." (*Id.*)

In May 2009, as her tenure as Village Manager was ending, Rush gave plaintiff his performance review for June 2008-May 2009. (*See id.*, Ex. 19, 2008-09 Performance Review.) On

a rating scale of 1-5, in which 5 is "outstanding," 4 is "exceeds requirements," 3 is "satisfactory,"

2 is "needs improvement" and 1 is "unsatisfactory," Rush gave plaintiff an overall rating of 4.38.

(*Id.*) Moreover, she said: "[Plaintiff] is an excellent department manager. He is a team player and

is willing to participate and support the department, the management team and the Village. He is

excellent under stress (flood) etc. During the 2008 floods, [plaintiff] and FD performed in an

excellent fashion. He will continue to be a great asset to the Village of Riverside." (*Id.*)

In June 2009, plaintiff and Buckley met with interim Village Manager Weaver to discuss

Buckley's need to improve his communications with and responsiveness to plaintiff. (Pl.'s Resp.

Village's LR 56.1(a) Stmt. ¶ 36.) Later that month, Buckley complained to Weaver that plaintiff

had given him a smaller merit pay increase than others in the fire department. (*Id.* ¶ 37.) The record

does not show whether or how Weaver responded.

On August 14, 2009, Buckley sent plaintiff the following email:

> I understand that you have stated in previous e-mails that you feel that we still have
> a [sic] issue communicating. I am starting to ascertain a much clearer picture as to
> why you feel this way. The issue at hand is that you must not want to communicate
> with me. I received a merit pay increase breakdown sheet in my mailbox recently.
> Which [sic] is a little strange since I had already signed one. I have since learned
> that I am the only employee in the Fire Department that has received one percent and
> that every other employee has recieved [sic] two percent. It is now my opinion that
> I am being singled out by you, the Fire Chief. Please respond to me in writing why
> I have only received a one percent merit increase. Also, a little communication on
> this issue would have made things much more understanding [sic], but you have
> failed to call or talk to me about this, even though we met in person on 8/5/09 in your
> office.

(Pl.'s Resp. Buckley's LR 56.1(a) Stmt., Ex. 7, Email from Buckley to Mulligan (Aug. 14, 2009).)

In October 2009, Peter Scalera became the Village Manager. (Pl.'s Resp. Village's LR

56.1(a) Stmt. ¶ 39.) In December 2009, Buckley complained to Scalera about his reduced pay raise,

which he blamed on plaintiff. (*Id.* ¶ 40; Village's LR 56.1(a) Stmt., Ex. C, Scalera Dep. at 93-94.)

When Scalera reviewed Buckley's pay history, he discovered that the reduction had, in fact, been made by Weaver. (*Id.* ¶ 37; Village's LR 56.1(a) Stmt., Ex. C, Scalera Dep. at 93-95.) Because Scalera "[could] not confirm the circumstances leading to . . . Weaver's decision," he gave Buckley the pay adjustment. (Village's LR 56.1(a) Stmt., Ex. C, Scalera Dep. Ex. 11, Letter from Scalera to Buckley (Dec. 15, 2009 ).)

Sometime in January 2010, Buckley and fire captain Bill Sherman told Scalera that they thought plaintiff had been drinking while on duty. (*Id.*, Ex. C, Scalera Dep. at 111-13.) Scalera interviewed eight fire department employees to determine whether plaintiff "had a drinking problem that was impacting his ability to manage the department." (*Id.* at 115.) Scalera concluded that plaintiff did not have a problem and had been seen drinking when he was off duty. (*Id.*)

On April 19, 2010, on Scalera's recommendation, the Village Board unanimously decided to renew plaintiff's employment contract. (*Id.* at 105; Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶ 46; *id.*, Ex. 16, Apr. 19, 2010 Bd. Trs. Meeting Minutes at 3.) The next day, Buckley requested and received a demotion from deputy chief to captain because he did not have "a good working relationship with [plaintiff.]" (Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶ 47; Village's LR 56.1(a) Stmt., Ex. C, Scalera Dep. at 123-27.)

On June 25, 2010, Scalera gave plaintiff his performance review for October 2009-June 2010. (*See* Pl.'s Resp. Village's 56.1(a) Stmt., Ex. 20, 2009-10 Performance Review.) On a rating scale in which 50-55 is "outstanding," 39-49 is "exceeds requirements," 29-38 is "satisfactory," 24-28 is "needs improvement" and under 24 is "unsatisfactory," Scalera gave plaintiff a rating of 48. (*Id.*) In addition, Scalera commented that plaintiff: (1) "has excellent communication skills . . . . an even disposition and can communicate with any type of individual"; (2) "is very approachable"

and "a fair and open-minded manager who wants to see his employees succeed and grow"; (3) "is

open to trying new methods and is willing to work with others"; and (4) "is a strong leader [who]

wants the team to emulate his success." (*Id.*)

On August 19, 2010, Buckley's lawyer sent a letter to the Village President and Board of

Trustees, which said:

> . . . . Mr. Buckley's performance reviews were consistently above-average until
> 2008, when he was promoted to Deputy Chief and began to discuss with [plaintiff],
> and later report to Village management, his concerns . . . . about [plaintiff's] issues
> with alcohol. . . . [Plaintiff] responded by retaliating against Mr. Buckley. Mr.
> Buckley's performance ratings suddenly dropped, he was excluded from a 2% merit
> increase (receiving only 1%) despite the fact that everyone else, including those with
> comparable performance ratings, received the 2% increase, and he was subjected to
> repeated, unwarranted criticism by [plaintiff].

(Village's LR 56.1(a) Stmt., Ex. C, Scalera Dep. Ex. 20, Letter from Major Law to Bd. Trs. (Aug.

19, 2010).) The letter also stated that Buckley had observed plaintiff on duty in an alcohol-impaired

state and had evidence that plaintiff had been drinking in area bars on the afternoons of July 29,

August 5, and August 11, 2010. (*Id.*) After receiving the letter, the Village put plaintiff on leave

pending an investigation. (Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶ 49.)

On September 12, 2010, while the Village was conducting its investigation, plaintiff

submitted a letter of resignation to the Village President that said:

> I have worked two jobs the last seventeen years. Although the Riverside position
> was considered part time, it was essentially a full time job as well. I find I can no
> longer serve in both jobs effectively. Therefore I am retiring/resigning from the
> Riverside position effective September 20, 2010.

(*Id.*, Ex. 24, Letter from Mulligan to Gorman (Sept. 12, 2010).) A week later, however, plaintiff

rescinded his resignation and asked for "the opportunity to address this matter with the Village

Board after [he] engage[d] counsel." (Village's LR 56.1(a) Stmt., Ex. D, Gorman Decl., Ex. 2,

Letter from Mulligan to Gorman (Sept. 19, 2010).)

5

The Board granted plaintiff's request, and on October 14, 2010, held a hearing on the allegations against him. (*Id.*, Ex. 3, Letter from Gorman to Mulligan (Sept. 21, 2010).) The record contains little information about the hearing, but the Board's post-hearing discussions suggest that they watched one or more videos submitted by Buckley that showed plaintiff drinking unidentified beverages in bars during the day. (Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶ 53; Pl.'s Resp. Buckley's LR 56.1(a) Stmt., Ex. 11, Oct. 14, 2010 Meeting Tr. at 1-4.) During those discussions many of the Board members said they believed plaintiff had been drinking on duty, but all of them agreed that there was not "absolute proof" of that fact. (Pl.'s Resp. Buckley's LR 56.1(a) Stmt., Ex. 11, Oct. 14, 2010 Meeting Tr. at 2-4, 25, 66.) After concluding that they could not "figure out evidencewise" whether plaintiff had been drinking, the members discussed whether plaintiff could run the department. (*Id.* at 15-16, 27-28, 56.) One member said, "I am very uncomfortable saying that . . . . we don't have proof that he is drinking on the job and regardless, we believe he can't lead the department, so he has to go." (*Id.* at 15-16.) Others noted that the fire department was split into two factions, one supporting plaintiff and the other supporting Buckley and that the Buckley faction "was driving the rift." (*Id.* at 27-28, 68.) Another member said Buckley was "the only . . . person behind all of these allegations" and said the timing of events was "suspicious": "[Buckley] decides to step down from Deputy Chief [to] Captain in May. By June he's going to a lawyer and getting a PI. So– so that the two things are twined together." (*Id.* at 16, 68.) Ultimately, the Board voted to reinstate plaintiff as fire chief. (Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶ 54.)

In January 2011, deputy fire chief John Buckley resigned, which apparently prompted another Board discussion about plaintiff. (Village's LR 56.1(a) Stmt., Ex. D, Gorman Decl. ¶ 15.) At the January 18, 2011 Board meeting, Scalera said: "Do I think [plaintiff's] capable of running

a department?  Yes.  Do I have concerns?  Yes.  Do I think he . . . may have a drinking problem?

Honestly, yes.  I think he . . . probably has a drinking problem.  And he has been very good at hiding

it." (*See* Pl.'s Resp. Village's LR 56.1(a) Stmt., Ex. 26, Jan. 18, 2011 Meeting Tr. at 51-52.)

On February 3, 2011 at 3:50 p.m., Captain Sherman told Scalera that plaintiff "was at Ricky

D's," a bar in the neighboring Village of Lyons, "drinking right now."  (Village's LR 56.1(a) Stmt.,

Ex. C, Scalera Dep. at 160 & Ex. 23, Mem. from Scalera to Bd. Trs. (Feb. 4, 2011).)  Shortly after,

Scalera asked plaintiff to come to his office, to which plaintiff responded that "would not be a good

idea." (Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶ 59.)  The next day, plaintiff admitted to Scalera that

he had been drinking in a bar the previous afternoon but said he was off duty.  (Village's LR 56.1(a)

Stmt., Ex. C, Scalera Dep. Ex. 23, Mem. from Scalera to Bd. Trs. (Feb. 4, 2011).)  He also said that

he had refused to go to Scalera's office because he "was no longer on duty[,] . . . did not plan to

return to the station[,] . . . had consumed one alcoholic drink and did not want [to] place [Scalera]

or [himself] in the position of explaining why he returned to work after being at a bar."  (*Id.*)

Scalera's emails to Board members in February 2011 state that Buckley was also involved

in the February 3, 2011 incident, though in his 2013 deposition Scalera said that Buckley played no

role. (*See* Buckley's LR 56.1(a) Stmt., Ex. 24, Email from Scalera to Board (Feb. 7, 2011); *id.*, Ex.

25, Emails from Sacchi to Scalera and from Scalera to Sacchi (Feb. 7, 2011), Email from Gorman

to Scalera (Feb. 7, 2011) & Email from Scalera to Sacchi (Feb. 8, 2011).)  Moreover, Scalera told

the Board he assumed Buckley was involved because Buckley was a Village of Lyons police officer

as well as a Riverside fire captain and the bar at issue was in Lyons.  (Pl.'s Resp. Buckley's LR

56.1(a) Stmt., Ex. 13, Mar. 7, 2011 Meeting Tr. at 10.)

7

After investigating the complaint, Scalera concluded that plaintiff had been off duty when he was seen in the Lyons bar and Buckley and Sherman were both on duty when they reported having seen him there. (Village's LR 56.1(a) Stmt., Ex. C, Scalera Dep. at 184-86.) Nonetheless, during the Board's February 7, 2011 Board meeting, the Village President recommended that plaintiff be terminated:

> . . . . I'm not making a judgment here as to whether [plaintiff] necessarily did something improper. What's going on here is, he clearly was put on notice . . . . [w]hen we cleared him of [the August 2010] allegations and kept him on . . . . that he has the full support of the Board. However, he is under a microscope . . . . and he had to bend over backwards to make the situation work. . . . [W]e talked about this other stuff about don't put yourself in a situation where you are going to embarrass ourselves and the Village.
>
> . . . .
>
> It still comes into [Scalera's] office constantly. . . . and [plaintiff ] always has an answer. . . . I'm not clocked in. I was changing my shirt because I can't have – he always has got an answer. He will always have answers.
>
> . . . .
>
> I am not accusing of him of drinking on the job here. . . . He put himself in a position that brought question into the matter. . . .

(Pl.'s Resp. Village's LR 56.1(a) Stmt., Ex. 27, Feb. 7, 2011 Meeting Tr. at 3-6.) Two Board members echoed Gorman's sentiments saying, respectively, "I'd fire him right now," and "I want him gone ASAP." (*Id.* at 10.)

On February 9, 2011, Village President Gorman told plaintiff that the Board had "deferred any action" on his employment until its next meeting, but plaintiff "had lost the support of the four Board members present at the [February 7, 2011] meeting" and would be terminated if he did not resign. (Pl.'s LR 56.1 Stmt. Add'l Facts Opp'n Village's Mot. ¶ 22.)

8

On February 17, 2011, plaintiff sent Scalera a letter complaining that he had been subjected

to workplace harassment:

> . . . . I believe I am an employee in a hostile work environment and being harassed
> by at least one other FD employee. I have endured complaints against me by a
> specific employee that has failed to prove his allegations, on more than one occasion.
> Furthermore this same employee now has followed me on my private off duty time
> and again made allegations of misconduct of me on paid company time (I was not)
> against me to you.
>
> . . . .
>
> In the most recent meeting with President Gorman (February 9, 2011), he informed
> me that he had four votes and will be removing me as the Fire Chief most likely at
> the next Village Board meeting on February 21, 2011. My removal he stated was
> based on the most recent complaint you received regarding me on my off time (not
> working or driving a Village vehicle).
>
>  . . . . This most recent complaint by an employee who was being paid . . . by the
> Village at the time he made the complaint while I was not is certainly proof that I am
> being harassed and working in a hostile environment. I also believe that the pending
> dismissal (per Village President Gorman) also factually supports my belief as well.
> At our last meeting, President Gorman stated, "It isn't anything to do with the
> firefighting stuff."

(Village's LR 56.1(a) Stmt., Ex. B, Mulligan Dep. Ex. 16, Letter from Mulligan to Scalera (Feb. 17,

2011).)

At the February 21, 2011 Board meeting, the following comments were made:

| Sells: | I am still not . . . clear. . . . why are we suspending him? |
|---|---|
| Shevitz | . . . . I believe he has a drinking problem. At this point, I think for him to put us in a position that we are in now four months after he said I am not going to put you guys in this position again, says to me this guy has a problem. |
| | . . . . |
| Sells : | But the . . . most recent allegation . . . is that he was in a bar having a drink when he was off duty. |

. . . .

Gorman:  It was 1:00 to 3:00 o'clock on a weekday afternoon in a bar neighboring our Village. When we finished out [sic] meeting in November . . . . I said . . . .[w]e support you 100 percent, but you. . . can't put yourself in this position. . . . And he put himself in this position.

. . . .

Shevitz:  . . . . I am very, very concerned about his personnel [sic] life, which does play into this because I don't know if he drinks on duty or not. I am still not convinced that he doesn't, okay, and he showed terrible judgment this last time. . . . I don't want this smoking gun to be him, you know, drunk and crashing a vehicle.

(*See* Pl.'s Resp. Village's LR 56.1(a) Stmt., Ex. 28, Feb. 21, 2011 Meeting Tr. at 29-31, 37.) The Board took no action, however, pending Scalera's investigation of plaintiff's harassment complaint.

On March 7, 2011, Scalera reported to the Board that his investigation into the harassment charge revealed that plaintiff was not properly managing Buckley. (*Id.*, Ex. 14, Mar. 7, 2011 Meeting Tr. at 22-23.) Trustee Sacchi commented: "[I]it seems like the timing of this is coincidental with this little incident that occurred. Is that the real reason we are letting him go?" (*Id.* at 23.) After further discussion about plaintiff's management skills, the following colloquy occurred:

Sussman:  . . . . At some point it's hard, but you have to say this person is not going to make it. He's never going to make it. And he's a detriment to the department. He's a detriment to the Village. And I'm talking about the risk of whether he's drinking on the job or not.

. . . .

Shevitz:  . . . . I still don't understand why we are focusing on the management piece of it when I think we generally acknowledge that the guy has an issue with alcohol and he's our chief, he's our fire chief. . . . I get your point. . . . What he does on his private time, as long as it doesn't impact his work time. But, you know, we are rolling the dice with

10

>that. . . .  Because, especially for a job like this, private time and work time are so intertwined.  And we gave him the benefit of the doubt the first time around and I feel like he screwed us.

Sussman:       Yeah.

Shevitz:       Because he put us in this position again.

(*Id.* at 27-28.)

On March 18, 2011, Scalera sent the findings of his investigation to the Board.  (Village's LR 56.1(a) Stmt. Ex. C, Scalera Dep. Ex. 10, Memorandum from Scalera to Bd. (Mar. 18. 2011).) Scalera concluded that "there was [no] harassment on the part of any employee leading to a hostile work environment."  (*Id.* at 10.)  However, he said:

>[T]he investigation did uncover several instances of unprofessional behavior on the part of both [plaintiff] and Buckley[, apparently] . . . due to their inability to get along.  The statements of those interviewed shows that tension between [plaintiff] and officers has made the management of the department difficult and that there is a clear difference of opinion over which direction the department should move. . . .

>The annual evaluation and meeting minutes clearly show that Buckley was not completing assigned tasks yet the file does not include any warnings and/or documents providing a timeline for improvement.  To assert that he was told "Buckley could not be touched" is not good management and [plaintiff] should have been [sic] discussed his understanding with the Village Manager sooner than when this investigation was begun.  I agree that the actions of the Captains has [sic] prevented [plaintiff] from managing the department and that they have been a negative influence on the department but the ultimate responsibility to address management issues lies with [plaintiff] who failed to take appropriate action.

(*Id.*)  Scalera recommended that plaintiff, Buckley and Sherman be terminated.  (*Id.*; *id.*, Ex. C, Scalera Dep. at 254.)

.    On March 21, 2011, the Board again discussed plaintiff:

Sells:          . . . .  So what is [sic] everybody feel about [plaintiff]?

Sacchi:         . . . .  I was very opposed to taking action against [him] because I am not going to fire somebody for having a drink on his own time.

> Otherwise, then whoever you – whoever you hire better never touch a drop.
>
> . . . .
>
> Reynolds: . . . . I don't think . . . anything he does on his personal time is any of our business. But I will say that I'm deferring to your judgment here, Peter [Scalera]. And I was not aware of some of the management issues that you . . . . bring up here. And so I am afraid he has got to go.

(Pl.'s Resp. Village's LR 56.1(a) Stmt., Ex. 29, Mar. 21, 2011 Meeting Tr. at 24, 27.) Ultimately, the Board told plaintiff he could resign or would be terminated. (Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶ 72.) Plaintiff refused to resign, and on March 23, 2011 was terminated. (*Id.* ¶ 73.) The Village did not terminate Buckley or Sherman. (Village's LR 56.1(a) Stmt., Ex. C, Scalera Dep. at 21-24, 254.)

## Discussion

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

**The Village's Motion**

In Count I, plaintiff alleges that the Village terminated him in violation of the ADA, which prohibits employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To defeat the Village's motion, plaintiff must offer evidence that suggests "(1) he is disabled within the meaning of the ADA, (2) []he is qualified to perform the essential functions of [his] job either with or without reasonable accommodation, and (3) []he suffered from an adverse employment decision because of [his] disability." *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669-70 (7th Cir. 2000); *see Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 964 (7th Cir. 2010) (holding that the ADA provides no relief for mixed motive claims). One way plaintiff can prove this claim is by presenting "a convincing mosaic of circumstantial evidence" that gives rise to a reasonable inference of discriminatory intent. *Terrugi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 660 (7th Cir. 2013) (quotation omitted). Such evidence may include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* at 659-60 (quotation omitted).

Viewed favorably to plaintiff, the record shows that: (1) in late 2008, after Buckley alleged that plaintiff had ben drinking on duty, the EAP concluded plaintiff did not have an alcohol problem, but the Village conditioned his return to work on execution of a "Last Chance Agreement." (Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶¶ 25-27; Village's LR 56.1(a) Stmt., Ex. B, Mulligan Dep. Ex. 12, Mem. from Rush to Mulligan (Dec. 31, 2008) & Last Chance Agreement.) In May 2009, Rush gave plaintiff an "exceeds expectations" performance rating for June 2008-May 2009 and said he was "an excellent department manager." (Pl.'s Resp. Village's LR 56.1(a) Stmt., Ex. 19, 2008-09

13

Performance Review.) In spring 2010, Scalera recommended, and the Board unanimously approved, renewing plaintiff's employment contract, and in June 2010, Scalera gave plaintiff an "exceeds requirements" performance rating for October 2009-June 2010. (Village's LR 56.1(a) Stmt., Ex. C, Scalera Dep. at 105; Pl.'s Resp. Village's LR 56.1(a) Stmt. ¶ 46; *id.*, Ex. 20, 2009-10 Performance Review.) In August 2010, Buckley again alleged that plaintiff was drinking on duty, and during the hearing on that allegation, many Board members explicitly stated that they believed plaintiff had a drinking problem. (*See generally* Pl.'s Resp. Buckley's LR 56.1(a) Stmt., Ex. 11, Oct. 14, 2010 Meeting Tr.) In January 2011, Scalera told the Board that he thought plaintiff had a drinking problem. (*Id.*, Ex. 26, Jan. 18, 2011 Meeting Tr. at 51-52.) On February 3, 2011, Buckley again told Scalera that plaintiff was drinking on duty, and though Scalera concluded that the complaint was unfounded, at a meeting a few days later, the Board members in attendance agreed that plaintiff should be fired because of the continual drinking complaints. (Village's LR 56.1(a) Stmt., Ex. C, Scalera Dep. at 160; Pl.'s Resp. Village's LR 56.1(a) Stmt., Ex. 27, Feb. 7, 2011 Meeting Tr. at 3-6, 10.) On February 9, 2011, the Village President told plaintiff he had lost the support of four Board members and would be terminated if he did not resign. (Pl.'s LR 56.1 Stmt. Add'l Facts Opp'n Village's Mot. ¶ 22.) At the February 21, 2011 Board meeting, various Trustees said they believed plaintiff had a drinking problem, but the Board deferred terminating him until his recently-submitted harassment complaint was investigated. (Pl.'s Resp. Village's LR 56.1(a) Stmt., Ex. 28, Feb. 21, 2011 Meeting Tr. at 29-31, 37.) In March 2011, Scalera said the investigation showed that plaintiff was improperly managing Buckley, though plaintiff's management skills had never before been criticized and he had been told he could not discipline Buckley. (*Id.*, Ex. 14, Mar. 7, 2011 Meeting Tr. at 2-3, 23, 27-28.) After investigating plaintiff's harassment complaint, Scalera

recommended that the Board fire plaintiff, Buckley and Sherman. (Village's LR 56.1(a) Stmt., Ex. C, Scalera Dep. at 254.) Plaintiff was the only one fired. (*Id.* at 21-24, 254.)

This evidence is sufficient to raise a triable fact issue as to whether the Village terminated plaintiff because of a disability. *See* 42 U.S.C. § 12102(1) (stating that an individual has a disability if, among other things, he is regarded as having "a physical or mental impairment that substantially limits one or more major life activities"); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir. 2011) (stating that alcoholism can be a disability if it significantly restricts an individual's ability to perform a major life activity like working); (Village's Mem. Law Supp. Mot. Summ. J. at 6-8 (assuming there is evidence to suggest that the Village regarded plaintiff as an alcoholic).)

In Count II, plaintiff alleges that the Village retaliated against him for his complaint of harassment in violation of the ADA. *See* 42 U.S.C. § 12203(a) (prohibiting an employer from discriminating against an employee because he has opposed an act prohibited by the ADA). To prevail on this claim, plaintiff must first make "a prima facie case of retaliation by demonstrating that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action." *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1117 (7th Cir. 2001).[1]

Even if plaintiff's letter complaining generically of harassment constitutes protected activity under the ADA, an issue the Court does not decide, there is no evidence to suggest that the Village fired him in retaliation for it. On the contrary, viewed favorably to plaintiff, the evidence suggests that the termination decision, though not implemented until later, was made at the February 7, 2011

---

[1]Direct evidence of retaliation can also be used to prove retaliation, *Kersting*, 250 F.3d at 1117, but plaintiff offers no such evidence.

15

Board meeting.  Because there are no facts to suggest that there is a casual connection between plaintiff's complaint of harassment and his termination, the Court grants the Village's motion for summary judgment on Count II.

In Counts III and V, plaintiff seeks to hold the Village liable for its alleged ADA violations under 42 U.S.C. § 1983.  The Seventh Circuit has yet to decide whether ADA violations can be the basis of a § 1983 claim.  However, other appellate courts, and district courts in this circuit, have held that "the comprehensive enforcement scheme[] adopted by Congress in the ADA . . . preclude[s] [plaintiffs] from seeking to enforce a violation of [the] statute through 42 U.S.C. section 1983." *Silk v. City of Chi.*, No. 95 C 0143, 1996 WL 312074, at *19 (N.D. Ill. June 7, 1996); *see Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002); *Lollar v. Baker*, 196 F.3d 603, 610 (5th Cir. 1999) (same); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011 (8th Cir. 1999) (en banc) (same); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997) (same); *Jones v. Reg'l Transp. Auth.*, No, 11 C 4924, 2012 WL 2905797, at *6 (N.D. Ill. July 16, 2012) (same); *Holmes v. City of Chi.*, No. 94 C 4083, 1995 WL 270231, at *5 (N.D. Ill. May 5, 1995) (same).  The Court agrees with the reasoning of these cases, and thus holds that plaintiff's § 1983 claims based on violations of the ADA are not viable.

**Buckley's Motion**

In Count IV, plaintiff asserts a defamation claim against Buckley for the February 3, 2011[2] drinking report to Scalera.  To prevail on this claim, plaintiff must show that Buckley made a false

---

[2]Plaintiff admits that the statute of limitations has expired for the other alleged statements.  (*See* Pl.'s Mem. Law Opp'n Buckley's Mot. Summ. J. at 13.)

16

statement about plaintiff, published the statement to a third party without having a privilege to do so and plaintiff was damaged as a result. *Popko v. Continental Cas. Co.*, 823 N.E.2d 184, 191 (Ill. App. Ct. 2005). "The communication of interoffice reports within a corporation has previously been determined to constitute a publication for defamation purposes." *Id.* Buckley contends that he is entitled to judgment on this claim because his alleged statement was absolutely privileged.[3]

"A communication is absolutely privileged when its propagation is so much in the public interest that the publisher should speak fully and fearlessly." *Anderson v. Beach*, 897 N.E.2d 361, 365 (Ill. App. Ct. 2008) (quotation omitted). An absolutely privileged statement does not give rise to a defamation claim even if the person who published it did so with an improper motive or knowledge that it was false. *Id.* at 366. "A communication is absolutely privileged if it was made in the discharge of a duty under express authority of law." *Id.* (quotation omitted); *see* Restatement (Second) of Torts § 592A at 257 (1977) ("[O]ne who is required by law to publish defamatory matter is absolutely privileged to publish it." ). A duty to speak "may arise by law or . . . from agency rules or regulations." *Goldberg v. Brooks*, 948 N.E.2d 1108, 1115 (Ill. App. Ct. 2011).

Buckley contends that he was compelled to make the report because Village Manager Rush and Village President Wiaduck told him, after he complained about plaintiff in December 2008, to report "any further issues with [plaintiff's] use of alcohol directly to the Village Manager." (Buckley's LR 56.1(a) Stmt., Ex. F, Buckley Aff. ¶ 3.) There is no admissible evidentiary basis for this argument, however, as Buckley offers only his own recollection of Rush and Wiaduck's out-of-court statements as support. (*See id.*); *see also* Fed. R. Evid. 801 (defining hearsay). Moreover,

---

[3]For purposes of this motion, Buckley admits that he made the February 3, 2011 statement. (*See* Buckley's Mem. Supp. Mot. Summ. J. at 1 n.1.)

even if it were adequately supported, this argument would still fail because management's alleged statement to Buckley, unlike the rules that have been held to confer privilege, has no coercive component, *i.e.*, make a report to the Village Manager or be disciplined. *See Anderson*, 897 N.E.2d at 365-66 (holding that plaintiff-police officer's report of another officer's allegedly illegal conduct was absolutely privileged because police regulations required plaintiff to make the report or face discipline); *Busch v. Bates* ,753 N.E.2d 1184, 1191-93 (Ill. App. Ct. 2001) (holding that a police officer's statement about another officer's alleged misconduct was absolutely privileged because department regulations require officers to report misconduct and subject them to "discipline and even separation from the department" if they fail to do so) (quotation omitted); *Weber v. Cueto*, 568 N.E.2d 513, 517-20 (Ill. App. Ct. 1991) (holding that a report by one lawyer of another lawyer's alleged misconduct was absolutely privileged because the rules of professional conduct require lawyers to make such reports, and if they fail to do so, subjects them to discipline). Thus, management's alleged statement is not a basis for granting summary judgment on the defamation claim.

Alternatively, Buckley argues that the statement was absolutely privileged because it was the first step in a quasi-judicial process. *See Starnes v. Int'l Harvester Co.*, 490 N.E.2d 1062, 1064 (Ill. App. Ct. 1986) (holding that complaints made to quasi-judicial agencies are privileged). "Whether any given proceeding by an administrative or executive body is quasi-judicial depends upon the powers and duties of the body conducting the proceeding and upon the nature of the proceedings themselves." *Kalish v. Ill. Ed. Ass'n*, 510 N.E.2d 1103, 1105-06 (Ill. App. Ct. 1987). Generally, a quasi-judicial body has the power to determine facts, make binding judgments, affect

the rights of private parties, compel the attendance of and examine witnesses, exercise judgment and enforce decisions. *Id.* at 1106.

Though the Board of Trustees held a hearing on Buckley's August 2010 charges against plaintiff, it is not clear whether the Board could or did compel any witnesses to testify, what evidence it considered and what facts, if any, it determined. (*See generally* Pl.'s Resp. Buckley's LR 56.1(a) Stmt., Ex. 11, Oct. 14, 2010 Meeting Tr.) What is clear, however, is that the Board was not required to hold a hearing. The Village Code vests the Village Manager, not the Board, with the power to hire and fire the fire chief. *See* Riverside Code § 2-13-2, *available at* http://www.sterlingcodifiers.com/codebook/index.php?book_id=610, ("The fire chief shall be appointed by the village manager, shall serve at the pleasure of the village manager and be subject to removal at any time by the village manager."). Moreover, in his 2010 employment contract with the Village, plaintiff explicitly waived any right to a termination hearing. (*See* Pl.'s Resp. Buckley's LR 56.1(a) Stmt., Ex. 9, Memorandum of Agreement § 3G ("The EMPLOYEE expressly waives any rights to a due process hearing with respect to any termination or other disciplinary action received, including those provided by the Village Code.").) Given the paucity of evidence about this gratuitous hearing, the Court cannot determine whether the Board is a quasi-judicial body for the purposes of plaintiff's defamation claim.

Buckley also argues that his report is absolutely privileged because he made it in his official capacity as a captain of the Village fire department. *See Horwitz v. Bd. of Ed. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 618 (7th Cir. 2001) (holding that statements about a teacher's absence made by school administrators to parents of students in the teacher's class were absolutely privileged because the administrators "were acting within the scope of their official duties and authority" when

19

they spoke with the parents). However, as discussed above, the record viewed in plaintiff's favor supports the inference that Buckley made the February 3, 2011 as part of a personal campaign to sabotage plaintiff, not in the execution of his duties as a fire captain.

The same evidence dooms Buckley's claim of conditional privilege, which applies to statements made in good faith and published solely to serve an important interest. *See Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 133 (Ill. 1993). Because this evidence casts doubt on Buckley's good faith in making it and motive for publishing it, he is not entitled to summary judgment on the grounds of conditional privilege. *See id.* at 134 (stating that qualified privilege is lost if defendant published information that he knew was false or with "a high degree of awareness of [its] probable falsity or . . . serious doubts as to its truth").

Finally, Buckley argues that the defamation claim fails on its merits because there is no evidence to suggest that he made the February 3, 2011 report with actual malice.[4] Buckley acted with such malice if he made the report with "subjective awareness of [its] falsity or probable falsity." *Solaia Tech. LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 842 n.3 (Ill. 2006). In Buckley's view, plaintiff's admission that he was in a bar as Buckley reported (*see* Pl.'s Resp. Buckley's LR 56.1(a) Stmt. ¶ 28), precludes a showing of malice. The issue, however, is not whether plaintiff was in a bar or was drinking, but whether he was on duty at the time. (*See id.* ¶ 24.) The only evidence Buckley offers on this point is that plaintiff went to a bar eight hours after he started work, which suggests that plaintiff was off duty, not on duty as Buckley claims. (*See* Buckley's LR 56.1(a) Stmt. ¶¶ 27-28.) The dearth of evidence concerning Buckley's motive coupled with the permissible

---

[4]The Court follows the parties' lead and assumes that plaintiff is a public figure.

inference from the record that he was a malcontent bent on plaintiff's ouster are sufficient to create a fact issue for trial on actual malice.

## Conclusion

For the reasons set forth above, the Court denies Buckley's motion for summary judgment [64] and grants the Village's motion for summary judgment [61] as to Counts II, III and V and denies it as to Count I.  At the next status hearing the parties should be prepared to set dates for filing the final pretrial order and for trial.

**SO ORDERED.**                                      **ENTERED:  June 3, 2013**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**